Kathy LINCOLN, Individually and as next friend of her daughter, Kelly Lincoln, Appellant,

v.

MID–CITIES PEE WEE FOOTBALL ASSOCIATION, Appellee.

No. 18146.

Court of Civil Appeals of Texas, Fort Worth.

Feb. 1, 1979.

Jacobs, Taylor & Cocanower and S. C. Cocanower, Fort Worth, for appellant.

Maynard & Farris and David F. Farris, Fort Worth, for appellee.

OPINION

SPURLOCK, Justice.

This is an appeal from the denial of a temporary injunction.

Kelly Lincoln is an eight year old female who played tackle football on the Pirate's team, in one of the Mid-Cities Pee Wee Football Association's leagues during its 1977 football season. Pee Wee is a nonprofit Texas corporation which operates football leagues for youths in the Hurst-Euless-Bedford area of Tarrant County, Texas. Kelly was one of four females who played during the 1977 season. She played without injury and was rated by her coach as an average player.

After the 1977 season ended, Pee Wee's board of directors, consisting primarily of the coaches, voted to change the league's structure. It decided to restrict participation in the existing leagues to male players, and to form a separate league for female players. Prior to the start of its 1978 season, Pee Wee held registration for all players. Because only eight females signed up to play in the girl's league, Pee Wee dropped it. However, it continued to limit participation in the existing leagues to males only.

Kelly, through her mother as next friend, instituted this action against Pee Wee seeking temporary and permanent injunctions to enjoin Pee Wee from excluding her, or alternatively to enjoin Pee Wee from the free use of public school facilities. Pee Wee teams practice and play games on fields it constructed and maintains on property owned by the Hurst-Euless-Bedford Independent School District. The trial court held a hearing to show cause why Pee Wee should not be temporarily enjoined from excluding Kelly from participation until a final hearing is held on whether she is entitled to a permanent injunction or other relief. The trial court rendered an order denying her a temporary injunction. She appeals this denial.

Kelly claims that Pee Wee's refusal to allow her to play in the male's league violates Tex.Const. art. 1, § 3a. This provision is commonly referred to as the Texas Equal Rights Amendment (ERA). The purpose of Kelly's request for a temporary injunction was to allow her to play in the league during the 1978 season while her petition for permanent injunction and other relief was pending. Because the season ended before this case was submitted for our consideration, we inquired upon oral argument whether questions concerning the propriety of trial court's denial of the temporary injunction were moot.

Pee Wee indicated that it would not change its policy of excluding females from participation in its existing leagues. Kelly indicated that she will want to play football during the 1979 season. We note the possibility exists that her petition for permanent injunction, which is still pending, may not be litigated to a final judgment by the time the 1979 season begins. Further, this case presents substantial constitutional questions in which there is presently much public interest. For these reasons we are convinced that this appeal is not moot.

Tex.Const. art. 1, § 3a provides:

"Equality *under the law* shall not be denied or abridged because of sex, race,

color, creed, or national origin. This amendment is self-operative." (Emphasis added.)

■ A cause of action for sex discrimination under the amendment has two basic elements. One, that the action alleged to be discriminatory denies equality because of sex. Two, that this action occurred under the law. Pee Wee freely admits that Kelly is denied the opportunity to play solely because she is female. Therefore, because of its admission no question concerning whether the discrimination is based on sex is raised and it needs no further discussion. The problem is whether Pee Wee's action is "under the law".

Kelly claims that the trial court abused its discretion in refusing to grant a temporary injunction because it erred in holding that Pee Wee's action was private conduct not encouraged by, enabled by, or closely interrelated in function with state action. Her position is that the trial court erroneously required her to prove state action when none is required by the Texas ERA. She correctly points out that the concept of state action was derived from the 14th amendment to the United States Constitution. The 14th amendment is obviously directed at the states in that it provides, "No State shall make or enforce any law . . ." It is well settled that the 14th amendment applies only where state action exists and does not apply to *purely private conduct.*

Kelly further notes that the Texas ERA is not specifically directed to the state or any particular entity, or individual. Therefore, she would have us construe "under the law" broadly enough to cover the facts of her case. This raises the issue of what is the proper construction of the amendment vis-a-vis state action.*

Basic to this issue is the inquiry of what intent the legislature and citizens of this state had when the amendment was adopted and ratified. The question presented is what degree of governmental involvement or activity, if any, did they intend to re-

---

* For detailed analysis on possible constructions of the Texas ERA see Schoen, The Texas Equal Rights Amendment in the Courts—1972–1977: A Review and Proposed Principles of Interpretation, 15 Hous.L.Rev. 537 (1978).

quire before the ERA would be applicable. A threshold question concerning the proper construction of the amendment is whether the Texas ERA was intended to enable our state government to go further in proscribing discriminatory activity than the federal government may under the 14th amendment. Or, was the Texas ERA intended merely to attempt to bring together and hopefully simplify the laws concerning proscription of discrimination in this state while still relying on the traditional federal approach.

■ Clearly "under the law" covers all actions of governmental entities. However, we do not believe that applicability of the amendment is or should be limited to only those cases involving sex discrimination via a statute, ordinance, or official policy. We believe such a construction was unintended and is too narrow. However, at the other extreme is the broadest construction of the amendment, abolishment of all sex discrimination, public and private. Here "under the law" is read in the most expansive context to enable the state the fullest use of its police power to socially engineer sex discrimination out of existence. This construction necessarily assumes that this state possesses the requisite police power to enforce such socialization of its citizens. We express no opinion on the validity of this assumption because we do not believe that "under the law" should be so broadly construed.

■ We do not believe "under the law" covers purely private conduct. We do not believe the Texas Era proscribes *purely private sex discrimination*. It is our opinion that the legislàture and citizens of this state desired to distill the myriad of federal doctrines concerning discrimination into a single simplified guarantee of sexual equality in governmental and public affairs. We cannot believe that by enacting the amendment they intended to have their private conduct regulated by the state. Private sex discrimination in many instances could be based upon what the individual perceives to be the proper role for men and women in society. Thus the private conduct could be considered an expression of the individual's social, moral, cultural, and religious beliefs.

While reasonable minds can and do differ, and many are quite emotional on this subject, it is certainly not for this court to hold that such private conduct is illegal absent a clear expression of intent from the legislature and the citizens of this state.

Had the amendment been intended to proscribe private conduct, we believe this proscription could and would have been clearly expressed to apply to all discrimination, public and private. This the legislature and citizens of Texas did not do. Rather, they guaranteed equality "under the law". This indicates to us that they intended to adopt the policy of sexual equality in the area of government and *public affairs*.

In a brief opinion the court of civil appeals in *Junior Football Association of Orange v. Gaudet*, 546 S.W.2d 70 (Tex.Civ. App.—Beaumont 1976, no writ), construed "under the law" under almost identical facts. It reversed the trial court's grant of a temporary injunction which would have allowed a young female to play football in a boy's league until the female reached puberty. The court construed "under the law" as follows:

"The words 'under the law' in the above article of the Texas Constitution require that the discrimination complained of is state action or private conduct that is encouraged by, enabled by, or closely interrelated in function with state action."

■ We believe this construction of "under the law" reaches an appropriate middle ground between extreme constructions of the amendment. It is our opinion that this construction most closely reflects the intent of the amendment. It guarantees equality in public affairs and in some cases when private conduct becomes so aligned with state function or involvement that it would be unreasonable to conclude that it is purely private discrimination. Yet, this construction does not have the courts and governmental agencies of this state dictating the private actions and relationships of its citizens which apparently reflect their fundamental beliefs. Far be it from this court to conclude that such beliefs are right or wrong.

We readily recognize that adoption of this construction of the amendment will result in the courts having to make some very difficult decisions in the future on whether a certain set of facts show state action or sufficient state involvement. We are convinced our task would be far easier if we were to adopt one of the more extreme constructions of the amendment. If we construed the amendment as applying only when sex discrimination occurs via a statute, ordinance, or official policy, or as proscribing all sex discrimination, public and private, we could probably avoid difficult factual questions from arising. However, it is not our own convenience with which we are concerned. It is the intent of the legislature and citizens of this state as to how they are to be governed on this issue which guides our decision.

In construing the amendment as requiring state action or sufficient state involvement so as to make it unreasonable to conclude that the action is purely private discrimination, we must inquire whether the private conduct is encouraged by, enabled by, or closely interrelated in function with state action. A showing that one of these situations exists would indicate that it is probably unreasonable to conclude that the action is purely private discrimination. We believe such a showing requires proof of some active rather than passive state involvement. The words encourage, enable, and function denote action. We distinguish situations where the state is merely passively involved—for example, the mere segregated use of public facilities where the state has no cause to inquire whether or not there is sex discrimination. The state's basic function is to serve the public at large regardless of its citizens' beliefs which may or may not result in private sex discrimination. The state, by enacting its Texas ERA, adopted the policy not to deny equality in its affairs because of sex. We conclude that purely private sex discrimination is not violative of the Texas ERA.

Anticipating that this court might so conclude, Kelly claims that state action has been shown and that the trial court's con-

clusion to the contrary is an abuse of discretion because its conclusion is against the great weight and preponderance of the evidence. Because this is an appeal from the denial of a temporary injunction pending final hearing and disposition, the merits of Kelly's case are not before us for review. We believe it necessary to clarify the law in this area to assist the parties upon final hearing. The only question for review is whether the trial court abused its discretion. We find no such abuse.

The trial court was bound to follow *Gaudet, supra*. The situation Kelly presents is almost identical to the facts in *Gaudet*. Therefore, it is certainly not an abuse of discretion for the trial court to conclude that no readily apparent basis for distinguishing this case from *Gaudet* exists and to follow it in denying Kelly a temporary injunction. Because the record in the case is still developing and we cannot presume that the evidence adduced at the show cause hearing will be the same as that developed at a full trial on the merits, we express no opinion nor comment on the evidence.

All of the appellant's points of error presented in complaint of the order of the trial court have been severally considered. Each is overruled. The order of the trial court is affirmed.